FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2004 NOV -1 P 3: 30

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES OF AMERICA,        )
                                 )
VS.                              )        NO. MJ-04-815-MBB
                                 )
TONY TEXIERA,                    )
        _Defendant._             )


## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS

The Defendant, Tony Texiera, submits this memorandum in Support of his

Motion to Suppress.

### FACTS[1]

On April 5, 2004, Troopers Telford and Jackson of the Massachusetts State Police

were on patrol in Brockton, Massachusetts. At around 7:30 P.M. the troopers saw a gray

Nissan Altima driving north on Clinton Street. The troopers clocked its speed at 41 mph

in a 30 mph zone. The troopers followed the Altima as it turned left on Pine Street, then

stopped it for speeding.

Trooper Telford approached the driver's side. Trooper Jackson approached the

passenger's side. Trooper Telford "...observed that there were three occupants and that

they were not wearing seatbelts." The front passenger seat was occupied by Jose

Correira, the right-rear passenger seat by the Defendant, Tony Texiera. When Trooper

---

[1] The fact section is based on Trooper Telford's police report. See attached.

Telford arrived at the driver's window, the operator, Edson Miranda, rolled it down, whereupon Trooper Telford "immediately detected the odor of freshly burnt marijuana."

Trooper Telford ordered Mr. Miranda out of the car and informed him that he could smell marijuana. Mr. Miranda stated that he had "just smoked up before getting into the car." Trooper Jackson ordered the other two occupants out of the car. Trooper Telford then "watched" the three men as Trooper Jackson searched the car. At some point Trooper Telford learned that the car was a rental, and that the only person authorized to drive it was a "female party," whom Mr. Miranda said was his girlfriend.

Trooper Jackson's search of the car yielded "some seeds and green leafy flakes in the center console and on the floor of the interior of the vehicle," and a "black handgun," which he found in the back pocket of the front passenger. The three men were handcuffed. Mr. Texiera then allegedly said, "It's my gun. They know nothing about it." Trooper Jackson then put Mr. Texiera in the rear of his police car and advised him of his Miranda rights.

Trooper Telford removed the gun, and observed that it was a black, semiautomatic Glock 9mm, and that one of the serial numbers had been removed. There were ten bullets in the magazine and none in the chamber. At the same time Trooper Jackson was asking Mr. Texiera about the gun. Mr. Texiera allegedly told him that it was "...a Glock 17, 9mm with ten bullets in the clip. There isn't one down the pipe." Trooper Telford then collected the "...seeds and...green leafy flakes."

Mr. Miranda was issued a citation for speeding and told to park the car so the person on the rental agreement could pick it up. Mr. Correira and Mr. Miranda were then allowed to leave. Mr. Texiera was arrested and taken back to the police station. On the

way, Mr. Texiera allegedly said that he had found the gun on the side of Glenwood

Street, and that he had "brought it with him in his left front jacket pocket and that he hid

it behind the right front passenger seat when [the police] pulled them over." He has been

charged with carrying an unlicensed firearm, unlicensed possession of ammunition,

possession of a large-capacity feeding device, defacing a firearm, and possession of

marijuana.

## ARGUMENT

1.     <u>The Search of the Car was Illegally Conducted</u>

After the car had been stopped, and after the occupants had been ordered out,

Trooper Jackson searched the car without a warrant. For a warrantless search to be

constitutional[2] it must be supported by probable cause. There must also be a legal

justification for the absence of a warrant. <u>United States v. Tibolt</u>, 72 F.3d 965, 968, 969

(1st Cir. 1995). In this case, even if, arguably, there was probable cause to search (based

on the odor of "freshly burnt marijuana"), there was still no justification for not seeking a

search warrant.

There are three exceptions to the warrant requirement that are potentially

applicable in this case. They are 1) exigency, or the "automobile exception,"; 2) the

search incident to arrest exception; and 3)  the inventory exception. Not one of these

applies in this case.

---

[2] The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure
on their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be
violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and
particularly describing the place to be searched, and the persons or things to be seized."

a.    *There was no Exigency*

The exigency or automobile exception allows the police to conduct warrantless searches if there is a risk that evidence or contraband will disappear or be destroyed before the police can get a warrant. Id. A search conducted under an exigency theory must still be supported by probable cause. Chambers v. Mahoney,  399 U.S. 42  (1970).

The burden is on the Commonwealth to show an exigency. United States v. Baldachinno, 45 F2d. 51 (1st Cir. 1974). The reasoning behind the automobile exception was described by the Supreme Court in Chambers, *supra*:

> [T]he circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable. Where this is true, as in Carroll and the case before us now, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search. Id., at 50, 51.

Put more simply, cars move, and circumstances that might require the police to secure a warrant for a house or other structure may be foregone if the target of the search is an automobile.

This is hardly a flat rule. If the automobile at issue isn't going anywhere, then the reasoning behind the automobile exception simply does not apply. The automobile might as well be an apartment building.  In this case, the Troopers determined before the search that none of the car's occupants was legally entitled to drive the car. Obviously, then, none of the three was going to drive it away immediately. After the search and discovery

of the evidence, Trooper Telford told Mr. Miranda to park it until "the person on the rental agreement could come pick it up." The car was therefore going to remain in a place known to the police for some indefinite period, and even if the authorized driver had shown up before the police could obtain a warrant, there was plenty of time for them to arrange for someone to follow the car.

b.      *The Search was not Conducted Incident to Arrest*

A search incident to arrest allows the police to search an arrestee and areas within his immediate control for weapons and evidence and contraband. Its *only* purpose is to protect the police from harm and to prevent the arrestee from destroying evidence or contraband. Chambers, *supra*. . It obviously makes no sense to search a car (or anywhere else) incident to arrest *before* the Defendant has been arrested. Similarly, it makes no sense to conduct a search incident to arrest when the Defendant has been removed from the car and is being "watched" by a police officer, since the car is not within the Defendant's immediate control. For this reason a search incident to arrest must be contemporaneous with the arrest. New York v. Belton, 453 U.S. 454, 461 (1981). In this case the search was done before the Defendant's arrest, and his arrest, in turn, was based entirely on what Trooper Jackson found during the search, i.e., the gun. This puts the cart squarely in front of the horse. The search was not incident to arrest.

c.      *The Search was not a Legitimate Inventory*

The purpose of an inventory is to protect property in an impounded vehicle. Colorado v. Bertine, 479 U.S. 367, 373 (1987)  In other words, an inventory allows the police to determine the contents of an impounded vehicle and to make a list of all valuables in order to, *inter alia*, protect themselves from possible claims of theft. It is not an investigatory search. Id.

In this case, the car had not been impounded, nor was it going to be. And again, the search was conducted before the Defendant was arrested. The police have no discretion regarding what to look for and where to look during an inventory; or, put another way,  the police cannot call a search an inventory when it is motivated by suspicion of criminal activity. Id., at 375.  According to the Massachusetts State Police Motor Vehicle Inventory Policy[3] ("the Policy"), the police are required and constrained to look in 1.) major areas of the interior; 2.) the floors; 3.) the glove compartment and trunk; and 3.) the exterior of the vehicle. In addition, the police may look in closed but unlocked containers.

Trooper Jackson's search was openly investigatory. Following his discovery of the gun he discontinued the search, something an officer undertaking a legitimate inventory search would of course not do. Furthermore, Trooper Jackson  never cited the Defendant for driving under the influence of marijuana, which one would ordinarily expect an officer to do if he "…immediately detected the odor of freshly burnt marijuana coming from inside the vehicle." It is obvious from this omission and the general behavior of the police throughout the stop that the search of the car was motivated entirely by the suspicion that it might contain evidence or contraband. The search was

---

[3] See attached

therefore not an inventory, and the discovery of the gun and the marijuana cannot be justified as one.

## **CONCLUSION**

The police were entitled to no exception for a warrantless search. For this reason, the gun, marijuana and any other evidence seized from the car must be suppressed.

Respectfully submitted,
FOR THE DEFENDANT, TONY
TEXERA,

Barry P. Wilson
BBO# 529680
LAW OFFICES OF BARRY P. WILSON
240 Commercial Street
Suite 5A
Boston, Massachusetts 02109
(617) 248-8979
(617) 523-8700 (Fax)

Dated: 11/1/04

| Offense/Incident | | | | |
|---|---|---|---|---|
| UNL CARRY FIREARM | BROCKTON POLICE DEPARTMENT ARREST REPORT | | Case No. 04004048 | |

| Offense Date and Time | Day | Arrest Date and Time | Day | Domestic Violence? |
|---|---|---|---|---|
| 04/05/2004   18:30 | Mon | 04/05/2004   18:30 | Mon | NO |

| Location of Offense | Apt | Sector | Wrd | Prec | Arresting Officer |
|---|---|---|---|---|---|
| 34/PINE ST | | SE | 5 | 5C | POLICE / OTHER |

| Defendant's Name | | Sex | Race | Hgt | Wgt | D.O.B. | A/J |
|---|---|---|---|---|---|---|---|
| TEIXEIRA        TONY | G | M | B | 510 | 135 | 03/22/1961 | ADULT |

| Defendant's Address | Social Security No. |
|---|---|
| 204/GREEN ST BROCKTON MA | 025484463 |

| Offense(s) Charged | A | | B | | C |
|---|---|---|---|---|---|
| UNL CARRY FIREARM | | UNL POSS AMMUNITIO | | POSS LG CAP FEEDDV | |
| | D | | E | | F |
| UNL POSS CLASS D | | POSS F/ARM W/ALT # | | | |

| Weapon(s) Used | Location of Arrest |
|---|---|
| | 34/PINE ST |

| Victim 1 | Sex | Race | D.O.B |
|---|---|---|---|
| SOCIETY | | | |

| Residence Address | Res Telephone | Bus Telephone |
|---|---|---|
| | | |

| Type of Property | Make | Model | Color 1 | Color 2 | Value |
|---|---|---|---|---|---|
| DRUGS/ILLICIT | GLOCK | 9MM | BLK | BLK | $ |

| Witness 1 | Sex | Race | D.O.B |
|---|---|---|---|
| JACKSON      TPR | U | U | |

| Residence Address | Res Telephone | Bus Telephone |
|---|---|---|
| 32 BELMONT ST DA'S OFFICE | | |

| Witness 2 | Sex | Race | D.O.B |
|---|---|---|---|
| TELFORD      TPR | U | U | |

| Residence Address | Res Telephone | Bus Telephone |
|---|---|---|
| 32 BELMONT ST DA'S OFFICE | | |

**Narrative:**

1   On Monday, April 5, 2004, at approximately 1830 hours, Tpr
2 Jackson and I (Tpr Telford) were on patrol in the city of Brockton
3 when we observed a gray Nissan Altima traveling north on Clinton St.
4 at a high rate of speed. I clocked the vehicle (MA 10FX39) at a speed
5 in excess of 41 mph for over a quarter of a mile in a posted 30 mph
6 zone. The Altima turned left onto Pine St. and I followed it and
7 activated my emergency lights. The Altima pulled to the right and
8 stopped in front of 34 Pine St.

| Offense/Incident | | Case No. |
|---|---|---|
| UNL CARRY FIREARM | BROCKTON POLICE DEPARTMENT<br>ARREST REPORT | 04004048 |

9 !      I approached the driver's side while Tpr Jackson approached the
10 ! passenger's side. I observed three occupants and that they were not
11 ! wearing seatbelts. I reached the operator's window and he put it down.
12 ! I immediatley detected the odor of freshly burnt marijuana coming from
13 ! inside the vehicle. I told him to exit the vehicle. I asked him for
14 ! his ID and he produced a paper temporary license that identified him
15 ! as MIRANDA, Edson DOB 10-26-79. I told him I smelled marijauna and he
16 ! replied that he had "just smoked up before gettting in the car." I
17 ! asked if he had anything on him and he said no. Tpr Jacksopn then had
18 ! the two passengers exit. CORREIA, Jose DOB 02-14-84 was sitting in the
19 ! front passenger seat and TEIXEIRA, Tony DOB 01-05-81 was sitting in
20 ! the right rear passenger seat. I watched all three subject while Tpr
21 ! Jackson searched the inside of the vehicle. I was able to determine
22 ! that the Altima was a rental vehicle and a female party was the only
23 ! person authorized to operate the vehicle due to the rental agreement.
24 ! MIRANDA said the female party was his girlfriend. Tpr Jackson then
25 ! located some seeds and green leafy flakes in the center console and on
26 ! the floor of the interior of the vehicle. Tpr Jackson entered the
27 ! right rear door of the vehicle and observed a bulge in the back pocket
28 ! of the right front passenger seat. He looked inside and saw a black
29 ! handgun. He advised me of the situation and we placed the three
30 ! subjects in handcuffs. TEIXEIRA then stated, "It's my gun, they knew
31 ! nothing about it." Tpr Jackson placed him in the rear of my cruiser
32 ! and advised him of his Miranda Rights and he said he understood. I
33 ! then advised MIRANDA and CORREIA of their Miranda Rights and they both
34 ! said they understood.
35 !      I put on latex gloves and secured the black handgun from the
36 ! pocket where Tpr Jackson located it. I saw that it was a black
37 ! semiautomatic Glock 9mm (marked as Glock 17). The serial number was
38 ! removed from under the frame but it was still located on the right
39 ! side of the weapon (serial # AGC340). I removed the magazine and saw
40 ! that it contained 10 rounds of ammunition. I racked the slide back and
41 ! the gun did not have a round in the chamber. At the same time Tpr
42 ! Jackson was asking TEXEIRA about the gun. He told Tpr Jackson that it
43 ! was a "GlOCK 17, 9mm with ten bullets in the clip. There isn't one
44 ! down the pipe."
45 !      I then entered the front of the vehicle and put some green flakes
46 ! and seeds from the center console area and collected them in a folded
47 ! peice of paper as evidence. I issued citation K4433923 to MIRANDA for
48 ! speeding. I had him park the vehicle so the person on the rental
49 ! agreement could come pick it up. MIRANDA and CORREIA were then
50 ! permitted to leave. Tpr Jackson and I then transported TEIXEIRA, the
51 ! Glock, the ammo, the magazine, and the green leafy substance to
52 ! Brockton PD. During the transport TEIXEIRA stated that he found the
53 ! gun on the side of Glennwood St. He said he brought it with him in his
54 ! left front jacket pocket and that he hid it behind the right front
55 ! passenger's seat when we pulled them over.
56 !      At the station, TEIXEIRA was booked without incident. The Glock,
57 ! the magazine (10 round capacity), and the 10 round of ammunition
58 ! (5 gold/5 silver shell casings) were submitted for testing and prints.
59 ! The flakes of green leafy substance were also submitted to be analyzed

| Offense/Incident | BROCKTON POLICE DEPARTMENT | Case No. |
|---|---|---|
| UNL CARRY FIREARM | ARREST REPORT | 04004048 |

```
60 ! at the crime lab,
61 !      It should also be noted that TEIXEIRA was asked if he had a
62 ! license to carry a firearm and he said he did not. MIRANDA and
63 ! CORREIA also did not have licenses to carry. '
```

Signed under the pains & penalties of perjury. (Arresting Officer Signature)

| Report Date | Supervisors Signature |
|---|---|
|  |  |



# Department of State Police
# *GENERAL ORDER*

| Effective Date | Number |
|---|---|
| **Dec. 01, 1992** | **TRF - 10** |

| Subject |
|---|
| **MOTOR VEHICLE INVENTORY** |

## 1.0    PURPOSE

To establish guidelines for the inventory of motor vehicles in order to:

o    Protect the owner's property;

o    Protect the officer(s) against claims from lost/stolen/vandalized property by item-izing the property in the vehicle and any containers within the motor vehicle;

o    Protect the officer(s) taking custody of this property from harmful items or substances which might be concealed in the motor vehicle.

## 2.0    DEFINITIONS

### 2.1    INVENTORY - A non-investigative proce-dure in which the contents of a vehicle are itemized and the condition of the vehicle is noted.

## 3.0    POLICY

Any vehicles ordered towed or in the custody of the State Police are to be inventoried and properly recorded.

## 4.0    PROCEDURE

### 4.1    SCOPE OF MOTOR VEHICLE INVENTORY

**4.1.1    Incidental to a Lawful Arrest** - The inven-tory should occur at approximately the same time as the operator is taken into custody, if possible.

**4.1.2    Statutory** - The vehicle is subject to statutory forfeiture or lawful seizure pursuant to a governmental interest, such as:

o    Search warrant;
o    Company or corporation distress warrant;
o    Repossession.

**4.1.3    Evidentiary** - The vehicle was used in the commission of a crime, as an instrument of a crime, is stolen, or contains evidence of a criminal nature.

**4.1.4    A motor vehicle inventory need not be taken when:**

o    It is legally parked and locked;
o    It is removed by a third party;
o    It is disabled with the operator and/or occupants present, and is towed at their request.

**4.1.5    A motor vehicle inventory also need not be taken when the vehicle interferes with the move-ment of traffic or creates other traffic safety problems and requires the prompt removal for public safety. Such instances include vehicles which are:**

o    Abandoned;
o    Improperly parked;
o    Involved in an accident;
o    Natural or man-made conditions.

### 4.2    MOTOR VEHICLE INVENTORY PROCESS

**4.2.1    A detailed inventory of the vehicle should be carefully planned and carried out. The partic-ulars of the situation or crime will dictate the sequential order to follow, but generally:**

o    The interior is inventoried according to the major areas. Starting with the left front (operator) to right front (passenger) and the left rear to right rear;

Page 1 of 2

| Subject | | Number |
|---|---|---|
| | **MOTOR VEHICLE INVENTORY** | **TRF - 10** |

o    These areas are then sub-divided into floor areas (same sequence), and then the surfaces of the instrument panel and rear deck above the rear passenger seat;

o    The glove compartment and trunk should follow the interior;

o    The exterior of the vehicle is then inventoried for missing or damaged parts.

**4.2.2**    The inventory listing of personal items and valuables will extend to all storage areas and compartments that are accessible to the operator and/or occupants.

o    This encompasses all open areas, including the area under the seats, the glove compartment, and other places where property is likely to be held.

o    All closed but unlocked containers should be opened, and each article inventoried individually.

o    A locked container should be inventoried as a single unit. A search warrant should be obtained prior to the search of such locked container unless consent to open the locked container is obtained from the owner of said container or the officer has probable cause to believe that such locked container will put the officer or others in immediate risk of injury or loss of life.

o    If a search warrant is in effect, all parts of the motor vehicle and all containers which might hold the evidence specified in the warrant will be inventoried. (A copy of the return will be attached to the inventory sheet.)

o    If an owner and/or operator requests to remove or entrust their possessions to another person without it impeding the towing or impoundment process, such request may be granted unless the officer has probable cause to seize the items.

**4.3    DUTIES**

**4.3.1**    The officer conducting the inventory will accurately record upon the motor vehicle inventory form a complete listing of the general condition of the vehicle and its contents.

o    This will be filed in a central location by the day and month. Records will be kept for one calendar year and then disposed of.

o    A copy may be filed with any report of investigation or arrest.

**4.3.2**    The officer will ensure that all articles taken for safekeeping are stored in an appropriate container and secured in the station contraband room.

o    An article may be left with the vehicle, if the owner so requests and time allows, by storing it in the trunk.

**4.3.3**    The officer will make, or cause to be made, proper station administrative journal entries.

**4.3.4**    The Station Commander will ensure that the routine, administrative care-taking of inventoried property is not a final deprivation of goods.

o    Any vehicle or article taken for evidentiary or other State Police purpose should not be kept longer than necessary.

**4.3.5**    The Troop Commander will strictly enforce the motor vehicle inventory procedure in order to avoid arbitrary application in determining the scope of the inventory process.

**5.0    REFERENCES**

**6.0    ACCREDITATION**

Page 2 of 2

| Promulgated By | Re-evaluation Date |
|---|---|
| **Col. Charles F. Henderson** | **Jan. 01, 1994** |